IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 21, 2012 Session

# COVERED BRIDGE RESORT ON WALDENS CREEK, LLC v. JOHNSON, MURRELL & ASSOCIATES, P.C. ET AL.

**Appeal by Permission from the Circuit Court for Sevier County**
**No. 2010-0112     Lawrence H. Puckett, Judge**

---

**No. E2011-01437-COA-R9-CV-FILED-JUNE 29, 2012**

---

Covered Bridge Resort on Waldens Creek, LLC ("Seller") sold its interest in an ongoing resort development to Tennessee Covered Bridge, LLC ("Purchaser"). Seller agreed to finance the sale and Purchaser agreed to secure the debt with a mortgage on the property. Mountain National Bank ("the Bank") agreed to loan Purchaser money to continue development of the property but required that its mortgage be in a first position. Seller agreed to subordinate its mortgage with the understanding that the members of Purchaser would personally guarantee the debt to Seller. Attorneys Charlie R. Johnson and Sherri E. Case of the firm of Johnson, Murrell & Associates, P.C. (collectively "the Lawyers") prepared the documents and handled the closing. Purchaser soon defaulted and Seller learned that Purchaser's members had refused to execute the guaranties. Seller filed this action against the Bank, the Lawyers and Purchaser[1]. When Seller took the deposition of the Bank's loan officer, the Bank, through counsel, instructed him not to answer several categories of questions on the ground of privilege. Seller filed a motion to compel which the trial court granted upon finding that the information at issue was not privileged. The trial court granted permission for an interlocutory appeal. This Court agreed to hear the appeal. We now affirm the order of the trial court (1) granting the motion to compel and (2) holding the Bank's motion for summary judgment in abeyance pending completion of discovery.

**Tenn. R. App. P. 9 Interlocutory Appeal by Permission; Judgment of the Circuit Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

---

[1] Also sued was Tennessee Covered Bridge Clubhouse, LLC. It appears that its interests are identical to those of Purchaser. For the most part, our references to "Purchaser" are meant to include "Tennessee Covered Bridge Clubhouse, LLC" as well.

P. Edward Pratt, Knoxville, Tennessee, for the appellant, Mountain National Bank.

Lewis S. Howard, Jr., and Joshua B. Bishop, Knoxville, Tennessee, for the appellee, Covered Bridge Resort on Waldens Creek, LLC.

Daryl G. Lowe, Knoxville, Tennessee, for the appellees, Johnson, Murrell & Associates, P.C., Charlie R. Johnson, and Sherri E. Case.

**OPINION**

I.

Seller is the original developer of a residential log cabin resort ("the Resort") in Sevier County. Seller began development of the Resort in phases and sold its first lots in 2002. The Lawyers represented Seller in preparing the documents and handling the closings of the lots sold by the Seller. After selling approximately 55 lots, Seller began negotiating with Purchaser to sell its remaining interest in the Resort.

Purchaser needed operating capital to fund the continuing development of the Resort. Seller introduced Purchaser to Mr. Larry Melton, an employee of the Bank. Mr. Melton, on behalf of the Bank, hosted a lunch meeting to discuss the Bank's possible participation. The meeting was attended by representatives of Seller and Purchaser as well as by the Lawyers. Seller and Purchaser were able to reach an agreement in principle for the sale. A few days after the meeting, on or about January 23, 2007, Seller and Purchaser entered into a purchase agreement pursuant to which Purchaser was to execute a note in favor of Seller, as well as a deed of trust to secure the note. The Lawyers drafted the purchase agreement.

The Bank agreed to provide a construction loan to Purchaser subject to obtaining two sources of collateral. One source was the personal guaranties of the members of Purchaser. A second source was the real property on which the Bank was to take and record a deed of trust. The Bank required Seller to subordinate its mortgage to the Bank's mortgage. Mr. Melton approached Seller about subordinating its mortgage. Seller alleges that Mr. Melton stated that Purchaser was strong financially and that the members of Purchaser would execute personal guaranties of Purchaser's obligation to Seller. Allegedly, Seller agreed to the subordination based on the statements of Mr. Melton.

The Bank had a long-standing, pre-existing relationship with the Lawyers. The Lawyers routinely handled closings of transactions funded by the Bank. The Bank allegedly hired the Lawyers to prepare the documentation for, and handle the closing of, the sale from Seller to Purchaser and the loan from the Bank to Purchaser. This, of course, included the

subordination agreement and the personal guaranties of members of the Purchaser to both the Bank and Seller. The Lawyers handled the closing by express mail. One of the documents included in those mailed by the Lawyers to Seller for its signature was a "Seller/Buyer Disclosure and Consent to Intermediary Representation." In pertinent part, the document, which Seller did execute, identifies the Lawyers as intermediaries and states:

> Rule 2.2 of the Tennessee Rules of Professional Conduct requires certain disclosures and written consent from clients when a lawyer is asked to, and reasonably believes that the lawyer can, provide impartial legal advice and assistance to two or more clients in the same transaction. Please consider the following:
>
> * * *
>
> 2. A lawyer's role is to be an advocate for the client advancing the interest of the client wherever possible even to the detriment of any other party. As an intermediary, my role will be to close this transaction in accordance with the sale contract and with local custom and practice to the extent that any matter should arise that is not specifically covered by the contract. . . .
>
> 3. . . . Further, anything you tell me in confidence that may affect any other client that I represent in this matter, I may be required to disclose during the course of this transaction or in the event a dispute arises.
>
> 4. You should be aware that I have other client obligations in this matter with clients with whom I may also have a working relationship for transactions other than the transaction as follows:
>
> (a) The lender for the buyer will make a loan only under specific written instructions by which I must agree to abide in order for the lender to fund this transaction. The lender is my client to the extent that I must comply with those instructions even though you are paying the fee for those services.

According to Seller, the documents, as executed, differ from the agreement of the parties in two respects. Allegedly, the subordination agreement was to apply only to the first

three phases of the development. The subordination agreement supplied for the closing applies to all five phases. Also, the Lawyers allegedly failed to include a provision in the purchase agreement requiring the members of Purchaser to execute personal guaranties of Purchaser's obligation to Seller. However, the packet of closing documents supplied to Seller included blank copies of personal guaranties of Purchaser's obligation to Seller by the members of Purchaser. Thus, Seller allegedly executed the closing documents believing that Purchaser's members would execute the guaranties. Seller's belief was reinforced by a letter from the Lawyers providing copies of the closing documents, minus the personal guaranties, with the assurance that the Lawyers would soon be forwarding the personal guaranties in favor of Seller. Allegedly, the Lawyers kept providing false assurance for about a year and, on or about March 4, 2009, informed Seller by letter that the members of Purchaser were unwilling to execute the guaranties. The Lawyers enclosed, in their March 2009 letter, a copy of a letter from Purchaser to the Lawyers dated March 17, 2007. Purchaser's letter advised that the members of Purchaser were unwilling to supply guaranties in favor of Seller. The Lawyers claim that when they received the March 2007 letter from Purchaser they advised all the parties to the transaction that the members of Purchaser would not execute the guaranties in favor of Seller.

Seller filed this present action after Purchaser stopped making its payments and defaulted on its obligations under the purchase agreement. Seller seeks to recover from the various defendants the damages it sustained as a result of Purchaser defaulting on the loan, which losses allegedly would not have been occurred if the principals of Purchaser had executed the guaranties in favor of Seller. As amended, the complaint alleges that Seller's damages are the result of legal malpractice by the Lawyers, negligence by the Bank, and breach of contract by Purchaser. The specific allegations as to the Bank are:

> [The Bank], by and through its employee, Mr. Larry Melton, negotiated the Subordination Agreement with [Seller] through [the Lawyers]. [The Bank] informed [Seller] that [Seller] would receive guaranty agreements from the Guarantors if [Seller] agreed to subordinate [its] Deed of Trust on Phases I, II, and III of the Property to [the Bank's] Deed of Trust. [The Bank] informed [Seller] that Purchaser and the Guarantors possessed a high net worth and were financially stable and capable of repaying the loans. [The Bank] was directly, or indirectly through its attorney, responsible for obtaining [the] personal guaranties . . . .
>
> [The Bank] failed to undertake to ensure that personal guaranties were executed as [the Bank] understood they would

be executed. [The Bank's] failure to ensure the personal guaranties were executed prior to closing the construction loan is a direct and proximate cause of the damages to [Seller] for which [the Bank] is liable.

One remedy Seller seeks is rescission of the subordination agreement, which, if it happens, would place Seller ahead of the Bank in lien priority with respect to the two mortgages. The Lawyers asserted in their answer that they did not act as advocates for Seller, but as intermediaries.

Seller took the deposition of Mr. Melton. During the deposition, Seller inquired about the following, as taken verbatim from Bank's brief:

(1) conversations between Melton and the . . . [L]awyers that purportedly led Melton to believe that [the Lawyers were] also acting as [Seller's] legal counsel,

(2) conversations between Melton and the . . . [L]awyers regarding the sale/purchase agreement between [Seller] and [Purchaser],

(3) conversations between Melton and the . . . [L]awyers regarding Purchaser members' personal guarantees of [Seller's] owner financing,

(4) whether Melton requested that [the Lawyers] prepare documents for [Seller],

(5) whether Melton agreed with the sworn interrogatory responses of the [L]awyers . . . , and

(6) e-mail communications between Melton and the . . . [L]awyers regarding the subject transactions.

(Record citations from Bank's brief omitted.) Counsel for the Bank objected to these inquiries on the basis of attorney-client privilege and instructed Mr. Melton not to answer. Melton was allowed to testify that it was his understanding the members of the Purchaser were providing personal guaranties of Purchaser's obligations to Seller and that had he known those personal guaranties were not being provided he would have stopped the closing and would not have funded the loan.

The Lawyers' interrogatory answers specific to conversations with Mr. Melton, are as follows:

> Charlie R. Johnson also communicated with Mr. Larry Melton regarding the actual closing of the transaction and the structure of the loan documents for [the] . . . Bank. Larry Melton was at that time a loan officer with [the] . . . Bank.
>
> Charlie R. Johnson did receive a letter by facsimile from [Purchaser] regarding the closing documents and package. The letter stated that personal guarantees were not negotiated with [Seller], the contract entered into by [Purchaser] did not require personal guaranties, [Purchaser] did not agree to sign any personal guaranty and that the individuals would not sign them. That letter and specifically that position was communicated to Larry Johnson [, manager of Seller,] who stated that he would be discussing this subject with the principals of [Purchaser]. Charlie R. Johnson also advised Larry Melton of the fact that [Purchaser] indicated that the members would not sign a personal guaranty for [Seller]. Larry Melton requested the personal guaranty documents be sent anyway because they had been requested by Larry Johnson.
>
> \* \* \*
>
> . . . . The . . . [Lawyers] had no duty to "obtain executed personal guaranty agreements benefitting [Seller] . . ." [Seller], as seller, failed to negotiate with [Purchaser,] the Buyer[,] to obtain personal guaranty agreements, personal guaranty agreements were not required by the terms of the contract [Seller] voluntarily and willfully entered into, and [Seller] is bound by the terms of the agreement it negotiated with [Purchaser]. . . . [I]t appears [Seller] had notice that members of [Purchaser] did not execute personal Guaranty Agreements on or about April 2, 2007, or in any event shortly before or after closing.

Seller filed a motion to compel responses to the questions posed to Mr. Melton. The trial court granted the motion holding that "[d]iscussions and correspondence between [the Bank] and [the Lawyers] regarding the transactions which are the subject of this cause are

not protected by the attorney-client privilege and are subject to discovery." The primary basis of the court's holding was that the Lawyers,

> as the drafting attorneys for all the parties in these transactions and specifically as attorney for [Seller] and [the] . . . Bank, thereby, owed a duty of loyalty to each of them in the overall transaction as to every detail of the closing including all the corollary transactions inherent in the law firm's handling of the closing for all the parties. As a result, each party to this discovery dispute *i.e.* both [Seller] and [the] . . . Bank had no reasonable expectation that communications to or from the law firm to either of them separately (or to or from the law firm and the other parties to the closing including the personal guarantors) would be confidential as to the others. The court finds the American Law Reports article on the inapplicability of the privilege where dual representation is involved persuasive on this point.

The court also noted that, in its answer, the Bank had asserted it could not be held liable for the actions of the Lawyers because the Lawyers were acting as "a dual agent." This assertion confirmed to the court's satisfaction that the Bank could not have expected that its conversations with the Lawyers would be sheltered by an attorney-client privilege from disclosure to the Seller. The court also held that the Bank had waived any privilege that might have existed by disclosing communications helpful to the Bank while attempting to withhold communications that might be harmful to it. The court drew an analogy to the principle that the privilege is to be used as a shield and not a sword.

In its order granting Seller's motion to compel, the court also dealt with the Bank's motion for summary judgment. The Bank asserted that Seller had admitted in the deposition of its manager, Larry Johnson, that the Bank never undertook to secure the personal guaranties of the members of Purchaser and that, therefore, any liability Seller sought to impose on the Bank must be for the acts of the Lawyers, as dual agents. The Bank asserted that it could not legally be held responsible to the other principal, Seller, for the acts of the Lawyers as a dual agent.

The court stated that "the Bank may be held liable for 'faulty' handling of information basic to the transaction should the facts at trial warrant." Therefore, the court ordered the motion for summary judgment held in abeyance pending completion of discovery.

The Bank asked the court to grant permission, pursuant to Tenn. R. App. P. 9, for an interlocutory appeal of its order. The trial court granted the Bank's request. This Court likewise granted the Bank's application in an order that did not specify the issue or issues that the Court would be addressing.

II.

The issues the Bank asks us to address, quoted verbatim from the Bank's brief, are:

> Whether two adverse parties who independently employ the same attorneys with respect to two related, but wholly separate transactions, may be considered "jointly represented" by said attorneys for purposes of waiver of the attorney-client privilege.
>
> Whether the trial court may compel disclosure of attorney-client communications at the insistence of a third party claiming joint representation, where the existence of the attorney-client relationship, a jury question, is a disputed issue of fact in its entirety as to the third party.
>
> Whether, if joint representation is ultimately found to exist, the court may compel disclosure of all communications between the joint clients and their attorneys, without determining whether the communications regarded matters of "common interest" between the joint clients.
>
> Where dual agency exists, whether the law refusing to impute the tortuous conduct of a dual agent to either principal applies in Tennessee, so as to result in the dismissal of [Seller's] claims of negligence against the Bank.

III.

A trial court's decision whether to allow discovery of material that is withheld under a claim of privilege is reviewed for abuse of discretion. *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010); *Powell v. Community Health Systems, Inc.*, 312 S.W.3d 496, 504 (Tenn. 2010). In *Lee Medical*, the Supreme Court said the following:

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased

likelihood that the decision will be reversed on appeal. It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. Thus, it does not permit reviewing courts to second-guess the court below, or to substitute their discretion for the lower court's. The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny.

Discretionary decisions must take the applicable law and the relevant facts into account. An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. . . .

To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions. When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the lower court's legal determinations de novo without any presumption of correctness.

*Lee Medical*, 312 S.W.3d at 524-525 (headings and citations in original omitted). A court's decision to hold a motion for summary judgment in abeyance pending completion of discovery is a discretionary act that is reviewed by us for abuse of discretion. *See Sanjines v. Ortwein and Associates*, 984 S.W.2d 907, 909 (Tenn. 1998).

IV.

We begin with the second issue raised in the Bank's brief because the implications of the issue as stated, and the arguments advanced in support of the Bank's position, attempt to create a sort of "Catch 22" for courts faced with discovery disputes that involve claims of privilege. The Bank argues that the existence of an attorney-client relationship is a question of fact and that the trial court, therefore, "improperly took the issue from the jury and

committed clear reversible error." Apparently the Bank would have us hold that any time there is a factual dispute of any kind over whether or not communications are privileged, the court must refrain from ruling until the jury decides the underlying factual issues. The Bank, of course, knows that such an approach would allow any person to hide any communication for which it could construct some colorable claim of privilege under the cloak of the privilege until it was too late to be useful. The law is clearly to the contrary as it must be. It is clear from the Supreme Court's opinion in *Lee Medical* that the trial court can and often must give its ruling on privilege issues in the discovery stage of the proceedings. *See* 312 S.W.3d at 524. When there are factual disputes that impact the discoverability of the information at issue, the trial court is free to make those findings. *Id*. On appeal, those findings are presumed correct unless the evidence preponderates against them. *Id*. at 525. The trial court's ultimate ruling is then reviewed for an abuse of discretion. *Id*. at 524. Accordingly, we reject any notion that the trial court erred by "prematurely" deciding factual issues that should have been reserved for a jury.

We will now consider together the first and third issues raised by the Bank, and the arguments related to those issues, because they both suffer from the common weakness of assuming that the communications between Mr. Melton and the Lawyers are privileged. Having made that assumption, the Bank then argues for a narrow view of a "joint represent[ation]" exception. The trial court made a factual finding that the communications at issue here *are not privileged* because, in the context in which they were made, they were not made with an expectation of privacy. As the trial court correctly observed, the "attorney-client privilege . . . is not absolute and does not protect all communications between an attorney and a client." *Flowers v. Tenn. Trucking Ass'n Self Ins.*, 209 S.W.3d 602, 616 (Tenn. Ct. App. 2006). "The communication must . . . be made with the intention that the communication will be kept confidential." *Id*. The party asserting a privilege has the burden of showing that the privilege is applicable. *Id*.

The evidence does not, by any stretch of imagination, preponderate against the trial court's findings. It was at a meeting attended by the Bank, Seller, Purchaser, and the Lawyers, that the parties were able to forge an agreement in principle for the purchase agreement and financing. Part of the discussion at that meeting was what the Bank would require for the transaction. It appears that, from the Seller's perspective, there was to be no subordination without guaranties from Purchaser's members. The evidence is all to the effect that everyone involved in the transaction communicated with everyone else toward bringing the closing to pass. Mr. Melton talked with Seller about the Bank's requirement of a subordination agreement, and he spoke to Purchaser to the effect that Seller would require personal guaranties from its members. He received and reviewed documents related to the sale; all the while, according to the sworn answers to interrogatories, he was talking to the Lawyers "regarding the actual closing of the transaction and the structure of the loan

documents for [the Bank]." The evidence preponderates in favor of, and not against, the trial court's finding that the communications between Mr. Melton and the Lawyers did not occur with an expectation that they would not be disclosed to the other parties to the transaction. We hold, therefore, that the trial court did not abuse its discretion (1) in holding that the requested communications were not privileged and (2) in granting Seller's motion to compel.

We do not find this to be an appropriate case for deciding whether we should adopt the "joint client exception" discussed in 4 ALR 4th, *Applicability of attorney-client privilege to evidence or testimony in subsequent action between parties originally represented contemporaneously by same attorney, with reference to communication to or from one party* (1981). The referenced article is consistent with the result we have reached in that it allows discovery of information shared between lawyers and clients, but the rationale for allowing discovery varies from case to case and jurisdiction to jurisdiction, as discussed in the article. Similarly, we do not find it necessary or appropriate to discuss whether a privilege that does not exist has been waived by the actions of the Lawyers, as asserted in Seller's brief. The trial court held, and we concur, that the communications at issue were not protected from disclosure by the attorney-client privilege.

This brings us to the last issue raised by the Bank, *i.e.*, whether the trial court erred when it decided to hold the Bank's motion for summary judgment in abeyance pending completion of discovery. We find no abuse of discretion, and, hence, no error in this decision.

The Bank argues that there is no evidence in the record that it undertook a duty, through its own actions, to the Seller. The short answer to this assertion is, simply, that the record is not yet complete. Potentially, our holding with respect to the issue of privilege will cause additional material evidence to come before the trial court on the factual issue of whether the Bank undertook a duty to Seller through its own actions. This evidence will also, potentially, impact the Bank's position that it cannot be held liable for the Lawyers as "dual agents." The trial court acted reasonably, and certainly within the parameters of its sound discretion, in deferring a decision on the Bank's motion until discovery has been completed.

If we were to decide the issue that the Bank presents, *i.e.*, whether the Bank is entitled to summary judgment, we would be deciding it in the first instance. That is not the proper exercise of our jurisdiction and "not the proper office of an interlocutory appeal." *Farmers Mutual of Tenn. v. Atkins*, No. E2011-01903-COA-R9-CV, 2012 WL 982998 at *5 (Tenn. Ct. App. E.S., filed March 21, 2012).

The Bank argues in its reply brief that the facts do not matter because, as a matter of law, it could not have voluntarily assumed some duty toward Seller without a writing to memorialize the obligation. The argument is based on Tenn. Code Ann. § 45-1-127(a) (2007), which states, in pertinent part, as follows:

> No financial institution . . . shall be deemed or implied to be acting as fiduciary or have a fiduciary obligation or responsibility to its customers or to other parties . . . unless there is a written agency or trust agreement under which the financial institution specifically agrees to act and perform in the capacity of a fiduciary.

We are aware of at least one case, cited by the trial court, that appears to be in direct conflict with the Bank's argument. In *Morimanno v. Middleton*, No. W1998-00563-COA-R3-CV, 1999 WL 1336081 at *1, 2 (Tenn. Ct. App. W.S., filed Dec. 15, 1999), we affirmed a judgment against a bank in favor of a seller of an automobile to whom the bank had given a verbal assurance that it had "verified" the buyer was soon to receive enough settlement proceeds to pay for the automobile.

There is a more fundamental reason why we are disinclined to grant relief on this issue. By raising the issue in its reply brief, the Bank has thwarted any ability of Seller to respond regarding the scope of the statute. We have held that it is improper to raise an argument for the first time in a reply brief. *Lockwood v. Hughes*, No. M2008-00836-COA-R3-CV, 2009 WL 1162577 at *4 (Tenn. Ct. App. M.S., filed Apr. 28, 2009) (*citing Frye v. St. Thomas Health Serv.*, 227 S.W.3d 595 (Tenn. Ct. App. 2007)). Moreover, if we decide this issue we would be deciding it without a predicate decision on the issue by the trial court and this is, again, "not the proper office of an interlocutory appeal." *Farmers Mutual*, 2012 WL 982998 at *5.

Nothing in our opinion should be construed as stating an opinion one way or another as to the merits of the Bank's motion.

## V.

The order of the trial court is affirmed. Costs on appeal are taxed to the appellant, Mountain National Bank. This matter is remanded, pursuant to applicable law, for further proceedings.

_____
CHARLES D. SUSANO, JR., JUDGE